UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

CLARENCE BERNARD             )
WILLIAMSON, a/k/a            )
MARK HOWARD                  )
                             )
    Plaintiff,               )
                             )
    v.                       )        10-CV-3325
                             )
WILLIAM TWADDELL and         )
RICHARD YOUNG,               )
                             )
    Defendants.              )

## OPINION

SUE E. MYERSCOUGH, U.S. District Judge:

This case is about Plaintiff's right to change and practice his religion in prison and about alleged retaliation for exercising his First Amendment rights.  Defendants' motion for summary judgment is before the Court.  For the reasons below, the motion will be denied.

## SUMMARY JUDGMENT STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is

entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).   A

movant may demonstrate the absence of a material dispute through

specific cites to admissible evidence, or by showing that the nonmovant

"cannot produce admissible evidence to support the [material]  fact."

Fed. R. Civ. P. 56(c)(B).  If the movant clears this hurdle, the nonmovant

may not simply rest on his or her allegations in the complaint, but

instead must point to admissible evidence in the record to show that a

genuine dispute exists.  Id.; Harvey v. Town of Merrillville, 649 F.3d 526,

529 (7th Cir. 2011).  "In a § 1983 case, the plaintiff bears the burden of

proof on the constitutional deprivation that underlies the claim, and thus

must come forward with sufficient evidence to create genuine issues of

material fact to avoid summary judgment."  McAllister v. Price, 615 F.3d

877, 881 (7th Cir. 2010).

At the summary judgment stage, evidence is viewed in the light

most favorable to the nonmovant, with material factual disputes resolved

in the nonmovant's favor.  Anderson v. Liberty Lobby, Inc., 477 U.S.

242, 248 (1986).  A genuine dispute of material fact exists when a

reasonable juror could find for the nonmovant.  Id.

## FACTS

These events occurred in Western Illinois Correctional Center ("Western"), where Plaintiff remains incarcerated.  Some of the cited exhibits refer to Plaintiff as "Mark Howard" rather than "Clarence Williamson."  Apparently Plaintiff is known under both names.  For clarity, the Court uses the term "Plaintiff."  Additionally, the Court notes that only those exhibits necessary to the Court's decision will be discussed.

Plaintiff was transferred from Stateville Correctional Center to Western in September 2007.  At that time, Plaintiff's identification card designated his religion as Black Hebrew Israelite, and he was receiving a vegan diet in accordance with his religious tenets.  Being designated as a Black Hebrew Israelite at Stateville had allowed him to attend "Israel God services," with which he felt more comfortable than the African Hebrew Israelite services offered.  (Pl.'s Dep. p. 18, d/e 81-2.)  In 2008, Plaintiff decided to eat the regular diet rather than a vegan diet.  Plaintiff

testified in his deposition that medical reasons counseled against his continued consumption of the soy in the vegan diet.  Id. at p. 55.

In early 2009, Plaintiff decided to change his religion to "Messianic" after communicating over the course of a year with Elder Vacca and learning about the teachings of Elder Vacca's group, known as "Yahweh's Assembly in Messiah," a Messianic group located in Missouri. (Pl.'s Dep. p. 17, d/e 81-2.)  According to Plaintiff, the term Messianic is similar to the term Christian in that both contain subsets of many separate religions.  For example, the Black Hebrew Israelite religion is a subset of the Messianic religion, just as the Catholic religion is a subset of Christianity.  (Pl.'s Dep. p. 20, d/e 81-2.)  According to Plaintiff, other subset religions falling under the Messianic label include African Hebrew Israelite, Messianic Hebrew, Hebrew, and Jewish Messianic.  (Pl.'s Dep. p. 59, d/e 81-2.)  The specific differences between  Messianic and Black Hebrew Israelite is unclear, but Plaintiff perceives a doctrinal difference. Plaintiff contends that Defendant Twaddell has been unaccommodating to religions like Black Hebrew Israelite and Messianic.  (Pl.'s Dep. p. 53,

4

d/e 81-2.)  He testified that no services are available for either religion.
Id. at pp. 63-64.

Plaintiff testified in his deposition that he began submitting written
requests to change his religion to Messianic in February 2009, ultimately
submitting at least three requests before he was taken to speak to
Defendant Chaplain Twaddell in May 2009.  (Pl.'s Dep. p. 14, d/e 81-2.)
Defendant Twaddell began his career in the IDOC as a correctional
officer in 1993 and has served as the Chaplain for Western Illinois
Correctional Center since 2004.  What training Defendant Twaddell
received for the chaplain position is not in the record.

After submitting an additional request on May 5, 2009, Plaintiff
was called for a meeting with Defendant Twaddell.  Plaintiff told
Twaddell about Plaintiff's desire to change his religious designation to
Messianic and to be baptized by Elder Vacca from Yahweh's Assembly if
possible.  According to Plaintiff, Chaplain Twaddell made some snide
remarks but then seemed to indicate the Plaintiff's request could be
accommodated if Plaintiff submitted verification of Elder Vacca's

credentials, to which Plaintiff agreed.  Id. at p. 24.  Plaintiff testified that being baptized was not an absolute requirement of the Messianic religion, but that baptism was part of the process of reforming oneself in which he wished to and should take part if possible.  Id. at pp. 30.

A memo dated June 8, 2009 from Defendant Twaddell to Plaintiff informed Plaintiff that Elder Vacca had been approved to enter the prison as Plaintiff's clergy.  (6/8/09 memo, d/e 81-2.)  Plaintiff testified in his deposition that he never saw this memo until during the discovery of this case.  (Pl.'s Dep. p. 32, 81-2.).  Further, Plaintiff's religious designation was not changed despite the approval of the visit, nor was Plaintiff's request for a kosher diet approved.  Defendant Twaddell did not officially approve or deny these requests after approving Elder Vacca's visit, despite Plaintiff's repeated inquiries.

In September 2009, Plaintiff filed a grievance to change his religious designation, stating that he had been seeking the change for six months through communications with Defendant Twaddell and Defendant Young, who was at the time the Assistant Warden of

Programs and Defendant Twaddell's supervisor.  Plaintiff's grievance asked for a change of religion to Messianic, baptism by someone from Yahweh's Assembly in Messiah, and accommodation of unspecified dietary tenets.  (9/23/09 grievance, d/e 81-2.)  Defendant Twaddell and Plaintiff both seem to agree that Plaintiff was referring to a kosher diet.

The response to the grievance states that Defendant Twaddell had not denied Plaintiff's change of religion and that steps would be taken to approve Elder Vacca's visit.  On December 1, 2009, Elder Vacca wrote a letter to Defendant Twaddell, purportedly to clarify an earlier phone conversation between them.  Elder Vacca stated that he wished to make clear that he sought entry to the prison not only to visit with Plaintiff, but also to baptize Plaintiff, which required full water submersion in a two-hour ceremony.  (12/1/09 letter, d/e 81-2.)  Defendant Twaddell responded that arrangements could be made to allow Elder Vacca to baptize Plaintiff in the prison chapel sometime after January 5, 2010. (12/19/09 letter, d/e 81-2.)  Defendant Twaddell asked Elder Vacca to submit documentation about "the requirements for the kosher diet."  Id.

Defendant Twaddell also asked if Plaintiff should be identified as a member of the "Assemblies of Yahweh," which was a designation available at the prison.  Elder Vacca responded that the Assemblies of Yahweh referred to a different group, and stated that, "[a]s to the Kosher Diet all I can say is we adhere to Leviticus 11: versus 1 thru 22.  There they mention each and every clean and unclean animal.  I will also enclose a couple of sheets that talk about the clean foods."  (12/23/09 letter, d/e 81-2.)

Despite being approved to visit, Elder Vacca did not come to visit Plaintiff and still has not come.  Nor has Plaintiff been baptized. Plaintiff's understanding is that Elder Vacca has not been able to travel because of health issues, and that Vacca's attempts to arrange for others to baptize Plaintiff have been unsuccessful.  (Pl.'s Dep. p. 49, d/e 81-2.)

Plaintiff filed another grievance on February 10, 2010, again asking for a change to his religious designation and a kosher diet.  The counselor's response suggests that Twaddell was requiring Plaintiff to be baptized first before considering those changes.  (2/10/10 grievance,

counselor's response.)

Defendant Twaddell continues to refuse to change Plaintiff's religion or to approve a kosher diet.  The reason Twaddell now gives is that Plaintiff is trying to obtain a kosher diet for nonreligious reasons. Twaddell avers that, in his opinion, Plaintiff's "request to change his affiliation was based on his desire to receive a kosher diet for nonreligious purposes.  As a result, I determined that had [Plaintiff] sincerely sought to change his religion, he would have pursued his request to be baptized by Elder Peter Vacca as he originally represented to me."  (Twaddell Aff. ¶ 18, d/e 81-3.)  Twaddell also avers that the "Messianic faith has no required kosher diet, but may rather require followers to adhere to a clean diet."  Id. ¶ 17.  Twaddell points out that Plaintiff made several non-kosher purchases from the commissary, which Twaddell believes further proves Plaintiff's insincerity.  However, Plaintiff testified that he had to buy non-kosher food in order to trade for kosher food due to commissary limits on purchases of kosher food.

On May 27, 2011, Defendant Twaddell denied Plaintiff's request

to participate in the Pentecost Feast on June 12, 2011, for the stated reason that Plaintiff had not submitted his request 45 days in advance as required by the rules.  (5/27/11 memo, 81-3.)  Plaintiff seems to maintain that he did send requests within the time, and that Defendant Twaddell had a pattern of not responding to those requests unless repeatedly contacted or a grievance was filed.

## ANALYSIS

## I.  RLUIPA AND THE FIRST AMENDMENT

Prisoners have a First Amendment right to reasonable opportunities to practice their religion, subject to the legitimate penological concerns of the prison.  <u>Maddox v. Love</u>, 655 F.3d 709 (7th Cir. 2011); <u>Ortiz v. Downey</u>, 561 F.3d 664, 669 (7th Cir. 2009).  The Religious Land Use and Institutionalized Persons Act ("RLUIPA") also protects an inmate's right to practice his religion, forbidding a "substantial burden" on that exercise unless the burden furthers a "compelling government interest" and is the "least restrictive means" of achieving that interest.  42 U.S.C. § 2000cc-1(a).  Only injunctive relief is available under RLUIPA, not

damages.  Grayson v. Schuler, 666 F.3d 450, 451 (7th Cir.

2012)(RLUIPA "does not create a cause of action against state employees

in their personal capacity," but injunctive relief is available).

Defendant Twaddell argues that he did not violate Plaintiff's rights

because he believed Plaintiff's religious requests were insincere.  He is

correct that only sincerely held religious beliefs are protected, so sincerity

is a relevant consideration.  Koger v. Bryan, 523 F.3d 789, 797 (7th Cir.

2008)(citing Cutter v. Wilkinson, 544 U.S. 709, 725 n. 13

(2005)("[P]rison officials may appropriately question whether a

prisoner's religiosity, asserted as the basis for a requested

accommodation, is authentic.").  However, Defendant Twaddell must

have reasonably believed that Plaintiff's professed religious choice was

insincere. See Grayson v. Schuler, 666 F.3d 450, 455 (7th Cir. 2012)(no

qualified immunity because no indication that defendant "reasonably

thought the plaintiff insincere in his religious belief.").

Here, a juror could conclude that Defendant Twaddell's current

stated reason for denial—Plaintiff's insincerity—was unreasonable or

pretextual.  A juror could conclude that Defendant Twaddell's true motivation was a dislike of  Plaintiff's religion, a dislike of Plaintiff, and/or a desire to retaliate against Plaintiff for Plaintiff's grievances, Plaintiff's communications with Twaddell's supervisor, Defendant Young, or Plaintiff's filing of this lawsuit.

Twaddell offers several reasons why he believes Plaintiff is insincere, none of which are persuasive.  Twaddell maintains that a kosher diet is not required by Plaintiff's current religion, citing Elder Vacca's letter. However, Elder Vacca's letter does not preclude a kosher diet as a way of meeting the religion's dietary tenets.  According to Plaintiff's undisputed testimony, a kosher diet *is* a way to satisfy those religious tenets.  Nor does Defendant Twaddell dispute that kosher foods satisfy Elder Vacca's definition of "clean" food.

Further, Plaintiff need not prove that a kosher diet is <u>mandated</u> by his religion.  The Seventh Circuit has repeatedly held that optional religious practices are protected under RLUIPA and the First Amendment.  Whether a religious practice is optional or mandatory has

no bearing on an inmate's sincerity.  For example, in <u>Koger v. Bryan</u>, 570 F.3d 868 (7th Cir. 2008), the Seventh Circuit held that requiring an inmate to show his religion required certain dietary restrictions was a substantial burden on the practice of his religion.  The inmate in <u>Koger</u> had requested a non-meat diet, even though his religion had no general dietary restrictions.  The Seventh Circuit concluded that the inmate's decision to eat a non-meat diet was an optional religious practice protected under RLUIPA.  The Seventh Circuit noted that "clergy opinion has generally been deemed insufficient to override a prisoner's sincerely held religious belief."  523 F.3d at 799.

The Seventh Circuit applied <u>Koger</u> in <u>Nelson v. Miller</u>, 570 F.3d 868 (7th Cir. 2009), to conclude that a prison chaplain's denial of a Catholic inmate's request for a diet excluding "four-legged meat" on certain days was a substantial burden on the practice of that inmate's religion, even though the Catholic religion does not impose such a requirement.  <u>Koger</u>'s reasoning was also applied in <u>Ortiz v. Downey</u>, 561 F.3d 664, 669 (7th Cir. 2009), where a Catholic pretrial detainee was

13

denied his request for a rosary and prayer book.  The Sheriff in <u>Downey</u>, who was also Catholic, had determined that the items requested by Plaintiff were not required for worship.  The Seventh Circuit reversed dismissal of that claim, explaining:   "A person's religious beliefs are personal to that individual; they are not subject to restriction by the personal theological views of another."  561 F.3d at 669; *see also* <u>Grayson v. Schuler</u>, 666 F.3d 450, 455 (7th Cir. 2012)("Prison chaplains may not determine which religious observances are permissible because orthodox.")(First Amendment claim regarding cutting of Plaintiff's dreadlocks survived summary judgment even though dreadlocks were not a requirement of Plaintiff's religion).

Thus, Defendant Twaddell cannot deny Plaintiff a kosher diet simply because other ways may exist to satisfy the dietary tenets of Plaintiff's religion.  *See* <u>Grayson</u>, 666 F.3d at 454.  Whether  some other kind of diet might suffice does not bear on Plaintiff's sincerity.  On this record, a kosher diet is an accepted option for practicing the dietary tenets of Plaintiff's religion.

Defendant Twaddell also points to Plaintiff's purchase of non-kosher items from the commissary as evidence of Plaintiff's insincerity. However, if Plaintiff is believed, he trades the non-kosher food for kosher food.  According to Plaintiff, this bartering, though against prison rules, is the only way Plaintiff can consume enough kosher calories to sustain himself, because he has been denied a kosher diet.  He cannot simply buy more kosher food because of the commissary limits on food purchases. (Pl.'s Dep. p. 67, d/e 81-2.)  Further, whether Plaintiff also eats non-kosher foods is not alone reason to doubt his sincerity about needing a kosher diet for religious reasons.  *See* Grayson v. Schuler, 666 F.3d 450, 454 (7th Cir. 2012)("a sincere religious believer doesn't forfeit his religious rights merely because he is not scrupulous in his observance"); Reed v. Faulkner, 842 F.2d 960, 963 (7th Cir. 1988)(inmate's "backsliding" on some of religious tenets could be considered but was not conclusive evidence of religious sincerity).

Defendant Twaddell points out that Elder Vacca has not come to visit Plaintiff, even though Twaddell cleared the way for the visit and

15

baptism.  Plaintiff testified that Elder Vacca has health issues precluding his visit, but, in any event, Plaintiff cannot control Elder Vacca.  The failure or inability of an outside member of the faith to baptize Plaintiff is not evidence of Plaintiff's religious insincerity.

Further evidence in Plaintiff's favor is the fact that the religious change he seeks is not a huge doctrinal shift.  Plaintiff would be participating in many of the same religious feasts and events.  In fact, he testified that the kosher diet would also be a way to satisfy the religious tenets of Black Hebrew Israelite, his prior religion.  (Pl.'s Dep. p. 62, d/e 81-2.)  Nor does Plaintiff have a pattern of frequently changing his religious designation.  Plaintiff's undisputed testimony is that his decision was not made lightly but after a long period of time communicating with Elder Vacca.

Defendant Twaddell's inconsistent treatment of Plaintiff also works in Plaintiff's favor.  At first Twaddell was willing to accommodate Plaintiff and did not appear to be questioning Plaintiff's sincerity.  Later, Twaddell appeared to refuse to change the religious designation because

16

Plaintiff had not been baptized, even though Plaintiff had no control over whether Elder Vacca visited him.  Now, Defendant Twaddell asserts that he denied Plaintiff's requests because Plaintiff is trying to obtain a kosher diet for nonreligious reasons.  A rational juror might conclude that Twaddell's current reason is a post facto justification.

Defendants also seem to suggest that accommodating Plaintiff's request would be costly and burdensome.  (Defs.' Undisputed Facts 19-21).  To the extent they argue that the cost and burden justify denial, their argument is conclusory.  They make no attempt to quantify the additional cost or burden, nor do they state whether kosher meals are being provided to other inmates.  Further, before now Defendant Twaddell never asserted cost as a reason in denying Plaintiff's requests.

Defendants also argue that Plaintiff's religious designation does not impede Plaintiff's religious practice.  However, the religious designation generally determines which religious activities Plaintiff may attend.  20 Il. Admin. Code 425.30(f)("Committed persons may only attend the religious activities of their designated religion.").  The religious

designation also apparently affects Plaintiff's ability to obtain a kosher diet.

In sum, on this record a rational juror could find for Plaintiff, drawing inferences in Plaintiff's favor.  Accordingly, Plaintiff's First Amendment and RLUIPA claims survive summary judgment.

Defendant Young argues that he should be dismissed for lack of personal responsibility.  *See* Kuhn v. Goodlaw, 678 F.3d. 552, 555 (7th Cir. 2012)("§ 1983 liability is premised on the wrongdoer's personal responsibility"); Chavez v. Illinois State Police, 251 F.3d 612, 651 (7th Cir. 2001)(no respondeat superior liability under § 1983).  Young avers that Twaddell was the only one who ruled on Plaintiff's requests, and that Young's involvement was limited to forwarding the documents he received from Plaintiff to Twaddell.   (Young Aff. ¶ 3, d/e 81-4); *see also* 29 Ill. Admin. Code 425.30(h)("Committed persons desiring to designate their religious affiliation after the orientation process or to change their designated religious affiliation shall submit the written request to the facility chaplain. The facility chaplain may refuse to change the affiliation

18

if it is determined that the change is being requested for other than religious reasons. This determination may be based, among other matters, on the frequency of changes or a pattern of changing religious affiliation prior to a particular faith group's scheduled holiday or celebration.").

However, the Court cannot rule out a plausible inference that Young was aware of Defendant Twaddell's actions, knew those actions deprived Plaintiff of his religious rights, and had the authority to intervene because of his supervisory position over Defendant Twaddell. Depending on what Young knew, he may have condoned or turned a blind eye to Twaddell's violations of Plaintiff's rights. Young's affidavit does not aver that the Young had no authority to intervene or review Twaddell's decisions regarding diet requests and religious designation changes. Young avers only that he "did not have the authority to supersede some decisions made by the Chaplain" and that requests like Plaintiff's were referred to the chaplain, who followed departmental rules. (Young Aff. ¶ 3, d/e 81-4.) Young does aver that he did not personally review or make the final decision on Plaintiff's requests, id., but Plaintiff

maintains that he had conversations with Young that would have put Young on notice of Twaddell's ongoing violations of Plaintiff's rights. *See* Matthews v. City of East St. Louis, 675 F.3d 703, 708 (7th Cir. 2012)("To show personal involvement, the supervisor must 'know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see.'")(quoted cite omitted).

Defendants' assertion of qualified immunity on these claims is rejected. The facial validity of the sincerity requirement or the requirement of 45 days notice for participation in a religious feast is not at issue here. The issue is whether the application of those requirements was arbitrary or pretextual. A rational juror could find that Twaddell's denial was arbitrary or motivated by a dislike of Plaintiff's religion, a dislike of Plaintiff, and/or retaliation for Plaintiff's complaints. Further, since at least 2008 Defendant Twaddell has been on constructive notice that an inmate's right to practice his religion extends to optional religious practices such as Plaintiff's kosher diet, and that requiring verification that an optional practice is mandatory violates an inmate's federal rights.

Koger v. Bryan, 523 F.3d 789 (7th Cir. 2008). Well before Koger,
Defendant Young had constructive notice that an inmate's "backsliding"
on some religious tenets is not conclusive evidence of insincerity. Reed v.
Faulkner, 842 F.2d 960, 963 (7th Cir. 1988).

The Court notes that damages and injunctive relief are available on
the First Amendment claim, but only injunctive relief is available on the
RLUIPA claim. Grayson v. Schuler, 666 F.3d 450 (7th Cir. 2012). The
contours of any injunctive relief will be determined by the Court after the
jury trial, if the jury finds for Plaintiff.

A word about damages on the First Amendment claim: Plaintiff
cannot recover compensatory damages for emotional suffering because he
has suffered no physical injury. 28 U.S.C. § 1997e(e)("No Federal civil
action may be brought by a prisoner confined in a jail, prison, or other
correctional facility, for mental or emotional injury suffered while in
custody without a prior showing of physical injury."). Nominal damages
of $1.00 and punitive damages are possible, but in the Court's experience
a jury is unlikely to award punitive damages in a case like this. Plaintiff

21

indicated in his deposition that he might be satisfied if his religious designation were changed to Messianic, he received a kosher diet and certain religious items, and his court costs were covered. (Pl.'s Dep. p. 81, 81-2.) Mediation or settlement discussions should be considered by the parties.

## II. EQUAL PROTECTION

On July 21, 2011, Judge Baker identified a possible equal protection claim, in addition to the RLUIPA and First Amendment claims identified in the merit review order. (7/21/11 Court Order, d/e 19, p. 3.) Plaintiff testified in his deposition that no worship services or chapel time are available to followers of the Black Hebrew Israelite or Messianic faiths, and that other faiths do have those worship opportunities. He also appears to maintain that Defendant Twaddell does not require inmates of other faiths to be baptized before changing their religious designation and obtaining a religious diet. Lastly, Plaintiff maintains that Jewish observers are treated more favorably than observers of the Messianic faith, in terms of religious feasts such as Passover and

other holy days.  Defendants do not address this claim in their motion for summary judgment.  Accordingly, the claim remains in the case.

## III.  RETALIATION

On October 17, 2011, the Court allowed Plaintiff to file a supplemental pleading alleging that Defendants had retaliated against him for this lawsuit by refusing to allow him to participate in Yom Kippur and other holy days.  (10/27/11 Court Order, p. 7, d/e 45.)  However, Plaintiff's later request to add more allegations of retaliation and new defendants were denied.  (11/10/11 Text Order.)   Thus, only the retaliation claim involving Yom Kippur and other unidentified holy days is before the Court.  Defendants do not address this claim; the claim therefore remains in the case.

IT IS THEREFORE ORDERED:

1) Defendants' motion for summary judgment is denied. (d/e 81). Plaintiff's constitutional claims for damages proceeds against Defendants in their individual capacities.  Plaintiff's claims for injunctive relief on his constitutional claims and under RLUIPA proceed against Defendants in

their official capacities.

2) The "Doe" defendants are dismissed without prejudice for failure to identify them for service.

3) Plaintiff's motion to submit additional facts is denied as unnecessary (d/e 101).

4) Plaintiff's "motion for disclosure statement" explaining why his motion for additional facts was timely submitted is denied as moot (d/e 106).

3) A final pretrial conference is scheduled for January 14, 2013 at 1:30 p.m.. Defense counsel shall appear in person. Plaintiff shall appear by video conference. The parties are directed to submit an agreed, proposed final pretrial order at least fourteen days before the final pretrial conference. Defendants bear the responsibility of preparing the proposed final pretrial order and mailing the proposed order to Plaintiff to allow Plaintiff sufficient time to review the order before the final pretrial conference. *See* CD-IL Local Rule 16.3.[1]

---

[1]The Local Rules are listed on this District's website: www.ilcd.uscourts.gov. A sample pretrial order is attached to those rules.

4)  The proposed final pretrial order must include the names of all witnesses to be called at the trial and must indicate whether the witness will appear in person or by video conference.  Nonparty witnesses who are incarcerated in the IDOC will testify by video.  Other nonparty witnesses may appear by video at the Court's discretion.  The proposed pretrial order must also include the names and addresses of any witnesses for whom trial subpoenas are sought.  The parties are responsible for timely obtaining and serving any necessary subpoenas, as well as providing the necessary witness and mileage fees.  Fed. R. Civ. P. 45.

5) The Court will circulate proposed jury instructions, a statement of the case, and proposed voir dire questions prior to the final pretrial conference, for discussion at the final pretrial conference.  Proposed additional/alternate instructions and voir dire questions must be filed five business days before the final pretrial conference.  The jury instructions, statement of the case, and voir dire questions will be finalized at the final pretrial conference, to the extent possible.

6) By five business days before the final pretrial conference, the

25

parties must file copies of all exhibits which they may seek to introduce at the trial, and a list of those exhibits. The exhibits should be marked. For example, Plaintiff should mark his exhibits as "Plaintiff's Ex. 1," "Plaintiff's Ex. 2," etc., for easy reference. The list of exhibits should list the number of the exhibit and a short description (for example, Plaintiff's Ex. 1: 12/23/09 letter from Vacca to Twaddell).

     7) Motions in limine are to be filed by December 10, 2012.

     8) The clerk is directed to issue a writ to secure the plaintiff's appearance at the final pretrial conference.

     9) The date for jury selection and the jury trial will be scheduled in a separate order.

     10) After the final pretrial order is entered, the Clerk is directed to issue the appropriate process to secure the personal appearance of Plaintiff at the trial and the video appearances of the video witnesses at the trial.

ENTERED:   September 4, 2012

FOR THE COURT:

                     s/Sue E. Myerscough
                  SUE E. MYERSCOUGH
                  UNITED STATES DISTRICT JUDGE